IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal Action No. 7:10-CR-16 |
| v. ) | |
| ) | |
| ) | By: Michael F. Urbanski |
| AARON GRANVILLE THOMPSON, ) | Chief United States District Judge |
| Defendant-Petitioner ) | |

## MEMORANDUM OPINION

This matter comes before the court on defendant Aaron Granville Thompson's motions for compassionate release. Thompson filed a pro se motion for compassionate release on January 31, 2022, and counsel for Thompson filed a supplemental motion on May 24, 2022. ECF Nos. 255, 273. The government responded in opposition on June 16, 2022, and Thompson replied on July 25, 2022. ECF Nos. 276, 283. The government filed a notice of new authority on December 6, 2022. ECF No. 284. For the reasons stated herein, the court will **DENY** Thompson's motions for compassionate release.

I.

On March 18, 2010, Thompson and a codefendant, Seth Linkous Thomas, were indicted on four charges related to drug distribution resulting in serious bodily injury and death. Indictment, ECF No. 3. Thompson and Thomas both were indicted on three counts: conspiracy to possess with intent to distribute or distribute a measurable quantity of fentanyl, the use of which resulted in death or serious bodily injury of another, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), all in violation of 21 U.S.C. § 846 (Count 1); distributing or aiding and abetting in the distribution of a measurable quantity of fentanyl, the use of which resulted

in serious bodily injury of another, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count 2); and distributing, or aiding and abetting in the distribution of a measurable quantity of fentanyl, the use of which resulted in the death of another, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 3). Thomas was indicted on the fourth count, distributing a measurable quantity of morphine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Indictment, ECF No. 3.

Thompson elected to plead guilty while Thomas proceeded to trial. On January 10, 2011, Thompson entered into a plea agreement pursuant to Fed. R. Civ. P. 11(c)(1)(C) in which he pled guilty to Counts 1, 2, and 3. On each count, Thompson faced a mandatory minimum sentence of 20 years and a maximum term of life. Plea Agreement, ECF No. 168 at 1–2. In the plea agreement, the parties agreed that Thompson would be sentenced to 240 months. Id. at 1. On April 12, 2011, Thompson was sentenced to 240 months on each count, with the sentences to run concurrently, to be followed by a three-year term of supervised release. J., ECF No. 199.[1] Thompson currently is housed at Federal Correctional Institution Hazelton and has a projected released date of December 15, 2029.[2]

## II.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all

---

[1] This case originally was before the Hon. James C. Turk. Upon his death, it was transferred to the undersigned.
[2] See https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (search "Aaron Granvill Thompson") (last viewed August 8, 2023).

2

> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Thus, Thompson's request for compassionate release requires the court to consider (1) if he exhausted his administrative remedies; (2) if so, whether there are extraordinary and compelling reasons that warrant a reduction in his sentence; and (3) if so, what, if any, sentence reduction is appropriate after considering the applicable 18 U.S.C. § 3553(a) factors.

The court begins by considering the threshold requirement for obtaining relief under § 3582(c)(1)(A). United States v. Muhammad, 16 F. 4th 126, 129–30 (4th Cir. 2021). This requirement, which is non-jurisdictional, is "satisfied if a defendant requests the Bureau of Prisons to bring a motion [for compassionate release] on their behalf and either fully exhausts all administrative rights to appeal the Bureau's decision or waits 30 days from the date of their initial request to file a motion in the district court." Id. at 131. Thompson submitted a request for compassionate release to the warden of his facility on July 6, 2021, ECF No. 255 at 26, and waited more than 30 days to file his motion for compassionate release. The government does not contest that Thompson has exhausted his administrative remedies. Accordingly, the court finds that Thompson has satisfied the statute's exhaustion requirements.

The court next must consider if it should "reduce the term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). The United States Sentencing Commission Guidelines Manual ("USSG") §

3

1B1.13 policy statement provides that "extraordinary and compelling reasons" exist where (A) the defendant is suffering from a terminal or serious medical condition; (B) the defendant is over 65 years old, has failing health, and has served at least ten years or 75 percent of his sentence, whichever is less; (C) the caregiver of the defendant's minor child dies or becomes incapacitated, or the defendant's spouse or partner becomes incapacitated and the defendant is the only available caregiver; or (D) as determined by the Director of the Bureau of Prisons ("BOP") for "other reasons" than, or in combination with, those described in Application Notes (A)–(C). The court notes that this policy statement, while governing only for BOP-filed motions for compassionate release, "remains helpful guidance even when motions are filed by defendants." United States v. McCoy, 981 F.3d 271, 280–84, 282 n.7 (4th Cir. 2020).

Thompson asserts three grounds for compassionate release. He first alleges that he is at an increased risk of serious illness or death if he contracts COVID-19. He also alleges that his sentence should be reduced because it is the same length as the sentence his codefendant received even though the codefendant was more culpable. Finally, he argues that he pled guilty before the United States Supreme Court decided Burrage v. United States, 134 S.Ct. 881 (2014), and that after Burrage, Thompson and his counsel might have opted to proceed differently, and the prosecution might have offered him a lower sentence.

### A. COVID-19

During the COVID-19 pandemic, this court found extraordinary and compelling reasons for compassionate release when an inmate showed both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility. But the assessment of compassionate release claims based on COVID-19 changed with the advent of

4

vaccines against the disease. According to the Centers for Disease Control and Prevention, all approved vaccines "are effective at protecting people from getting seriously ill, being hospitalized, and dying."[3]

Thompson's medical records indicate that he suffers from obesity, osteoarthritis in his knees, type II diabetes mellitus, hyperlipidemia, hypertension, gastroesophageal reflux disease, cervicalgia, and edema. Med. Rs., ECF Nos. 255 at 64, 276-1 at 1. He has been vaccinated against COVID-19. Mot., ECF No. 255 at 8. Because Thompson has been vaccinated, he cannot show that he has a particularized risk of contracting the disease. "'[F]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release.'" United States v. Torres, No. CR 3:18-282-MGL-2, 2023 WL 2976180, at *3 (D.S.C. Apr. 17, 2023) (quoting United States v. Broadfield, 5 F.4th 801, 803 (7th Cir. 2021)). See also United States v. Evans, No. 4:04-cr-00140-TLW, 2022 WL 286190 at *3 (D.S.C. Jan. 31, 2022) (finding defendant with diabetes mellitus could not show an extraordinary and compelling reason for compassionate release because he had been vaccinated against COVID-19); and United States v. Smith, No. 3:15cr101, 2021 WL 3641463 at *3 (E.D. Va. Aug. 17, 2021) (citing to publications from the Centers for Disease Control and Prevention that "the Moderna vaccine is 94.1% effective at preventing illness from COVID-19.")

In addition, Federal Correctional Institution Hazelton, where Thompson is housed, currently has no cases of COVID-19 in the facility.[4] The lack of COVID-19 at the facility

---

[3] See Ctrs. for Disease Control and Prevention, Benefits of Getting A COVID-19 Vaccine, (updated July 17, 2023). https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (last viewed August 8, 2023).

[4] https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last viewed August 22, 2023).

supports the conclusion that Thompson is not at risk for contracting COVID-19 and that the measures taken at FCI Hazelton are appropriate to deter potential infection in the future. For these reasons, Thompson has not demonstrated that his health concerns are sufficiently extraordinary or compelling to warrant any sentence reduction under 18 U.S.C. § 3582(c). See United States v. Barcliff, No. 2:14-cr-00003, 2023 WL 3066140, at *3 (S.D.W.V. Apr. 24, 2023) (finding that even if inmate's obesity might increase his risk of experiencing serious illness should he contract COVID-19, he could not show a particularized risk when there were zero cases of COVID-19 at his facility); United States v. Trapp, No. 1:19CR54-1, 2023 WL 2978941 at *3 (N.D.W.V. Apr. 17, 2023) (concluding that even though inmate had risk factors of diabetes and hypertension, his conditions were well-treated and there were zero cases of COVID-19 at his facility, making his risk of exposure negligible); United States v. Stewart, No. 3:15cr13, 2022 WL 2070616, at *3 (E.D. Va. June 8, 2022) (finding that the combination of the effectiveness of the vaccine, the high rate of vaccination at inmate's facility, and low number of active COVID-19 cases at facility indicated inmate was not at particularized risk for contracting COVID-19). Accordingly, Thompson fails to demonstrate an extraordinary and compelling reason for compassionate release based on the concern of contracting COVID-19 and the court must **DENY** his motion.

### B. Sentencing Disparity

Thompson makes two distinct "sentencing disparity" arguments. He first argues that because his codefendant was successful on appeal in having his conspiracy conviction vacated, a sentencing disparity has been created between himself and his codefendant. He also argues that if he had been indicted after the Burrage case was decided, he could have bargained for a

6

shorter sentence because there was no evidence from which a jury could have concluded that the fentanyl patch Thompson provided to the man who died was the "but for" cause of the man's death. The court will address the Burrage argument first.

### (1) Effect of Burrage[5]

In Burrage, which was decided several years after Thompson was convicted, Joshua Banka died after overdosing on drugs, including heroin he bought from defendant Burrage. The evidence showed that Banka started a drug binge by smoking marijuana and later in the day crushed, cooked, and injected oxycodone. That evening, he bought one gram of heroin from Burrage and immediately cooked and injected it. Later that evening he injected more heroin. The next morning, he was found dead in his home. A search of his house and car turned up syringes, 0.59 grams of heroin, alprazolam and clonazepam tablets, oxycodone pills, a bottle of hydrocodone, and other drugs. Burrage, 571 S.Ct. at 885.

Burrage pled not guilty to distributing heroin and to the charge that he had unlawfully distributed heroin and that "death . . . resulted from the use of th[at] substance," under § 841(b)(1)(C). At trial, a medical expert testified that multiple drugs were present in Banka's system at the time of his death, including heroin metabolites, codeine, alprazolam, clonazepam metabolites, and oxycodone. Id. at 207. Although morphine, a heroin metabolite, was the only drug present above the therapeutic range, the doctor could not say whether Banka would have lived had he not taken the heroin. He did conclude, however, that heroin was a contributing

---

[5] The court acknowledges that the government argued that Thompson is precluded from making a claim under Burrage by the holding in United States v. Ferguson, 55 F.4th 262 (4th Cir. 2022). In Ferguson, the court held that a collateral attack on a conviction or sentence must be brought in a § 2255 petition and not in a compassionate release petition. Id. at 272. However, the court does not address this issue because it is clear that Burrage has no effect on Thompson's conviction or sentence, regardless of the statute under which he might bring the claim.

factor in Banka's death because it interacted with the other drugs to cause respiratory or central nervous system depression. Id. The state medical examiner reached a similar conclusion, describing the cause of death as "mixed drug intoxication" with heroin, oxycodone, alprazolam, and clonazepam all contributing to Banka's death. The medical examiner could not say whether Banka would have lived had he not taken the heroin but testified that his death would have been "very less likely." Id.

Burrage was convicted and the Eight Circuit Court of Appeals affirmed. The Supreme Court granted certiorari on two questions: whether a defendant may be convicted under the "death results" provision of § 841(b)(1)(C) when (1) the use of the substance is a "contributing cause" of the death and (2) without instructing the jury that it must decide whether the victim's death by overdose was a foreseeable result of the defendant's drug-trafficking offense. Id. at 208. The Court vacated the guilty verdict and remanded the case, holding that

> at least where the use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury.

Id. at 218-19 (emphasis added).

Thompson now argues that if Burrage had been decided before his conviction, he "may have had strong arguments against the statutory enhancement for causing serious bodily injury to Mr. Clark and may not have been subject to the mandatory statutory minimum for this offense." Supp. Mot., ECF No. 273 at 7. However, as discussed below, the facts underlying Thompson's conviction make this argument unpersuasive.

The following factual summary is taken from the Presentence Investigation Report (PSR), ECF No. 203 ¶¶ 4–9. Thompson and Thomas were frequent visitors to the Smokey

Ridge Apartments in Christiansburg, Virginia, and were known to have distributed fentanyl to residents of the apartment complex. On November 28, 2007, three emergency phone calls were made to 911 in reference to a drug overdose at an apartment within the Smokey Ridge Apartment complex. Paramedics arrived and found James Clarke non-responsive. They were able to revive him before he was transported to the hospital in Christiansburg. At the hospital, Clarke admitted to using fentanyl and, according to his physician, fentanyl was used in a manner that put him at a high risk of death. Despite the insistence of attending medical personnel that he remain at the hospital, Clarke chose to leave after he appeared stabilized. According to his doctor, Clarke continued to face a substantial risk of serious bodily injury or death by leaving the hospital at that time.

On November 29, 2007, emergency personnel responded to an early morning call to a residence on Otey Road in Floyd, Virginia. A Floyd County deputy sheriff arrived on the scene and found Barry Paul Duncan unresponsive. Resuscitative efforts were unsuccessful and Duncan was pronounced dead at 7:15 a.m. The cause of death was identified as acute combined fentanyl and methadone poisoning. The medical examiner would later tell investigators that although methadone was present in the deceased's femoral blood, it was not a sufficient level that would result in death. She further concluded the level of fentanyl, at .018 mg per liter, was clearly above the lethal level and Duncan would have died of fentanyl poisoning without the presence of methadone.

Law enforcement agents learned that on November 28, 2007, Clarke had sought to purchase morphine pills from drug associate and Smokey Ridge Apartment neighbor, Kenneth Ponder. At the time, Seth Thomas was present, but neither Thomas nor Ponder had any

9

morphine to sell. Clarke's girlfriend, Whitney Boothe, returned from work later that day and was approached by Thomas to see if she was interested in the purchase of a fentanyl patch, commonly referred to as a "morphine patch." Boothe told Thomas she was not interested and headed for her apartment to take a nap. At approximately 3:30 p.m., Thomas and Thompson arrived at Clarke's residence. Clarke observed Thomas with some patches, but Thompson also had several and provided Clarke with a patch. Clarke had made previous purchases of oxycontin, morphine pills, and other narcotics from Thompson. While Boothe napped, Clarke removed the gel from the patch and diluted it with rum in syringes before heating one and injecting the mixture intravenously. Clarke overdosed before he could make another injection but had yelled for help before collapsing. Steven West had been in the apartment at the time, and he had been the one to suggest to Clarke how to "break down" the patch with alcohol before Clarke tried it. West saw that Clarke needed help and carried him to the bedroom where Boothe was sleeping. West awakened Boothe and she observed Clarke in an unconscious state. Thomas called 911 but left the Smokey Ridge Apartments before the arrival of police.

A short time later, Thomas arrived at Barry Duncan's residence on Hammes Street in Christiansburg. Duncan lived at this residence with his roommate, Jason Politis. At the time of Thomas's arrival, Duncan, his girlfriend, Tracie McDougal, and friend, Amber Dalton were present. Thomas was observed in a state of stress and related that he had just come from the Smokey Ridge Apartments where a drug overdose occurred.

Duncan talked to Thomas about having back pain and Thomas said he had something for it. Thomas was observed pulling a white foiled package from his boot that he referred to as a morphine patch which he would sell for $30. Duncan replied he was interested but would

not have the funds until the following day. McDougal heard Thomas agree to "front" the patch to Duncan before they entered the bathroom where Thomas told Duncan to raise his shirt. McDougal later testified she heard Thomas tell Duncan that chewing on the patch was an option if the adhesive did not work. Duncan left the residence to have dinner with his parents after having been picked up by his father.

Thomas, McDougal, and Amber Dalton left together and arrived at the residence on Otey Road in Floyd that Amber Dalton shared with her sister, Candice Dalton. Candice Dalton and her boyfriend, Chris Cooper, were at the residence when Thomas, McDougal, and Amber Dalton arrived.

In the meantime, Duncan was with his parents and while at their house, he went into the bathroom alone. When he came out, he called McDougal for a ride. Thomas went with McDougal to pick Duncan up at his parents' house. Duncan appeared under the influence as his speech was slurred and his gait was staggered. McDougal questioned Duncan about his behavior and Duncan indicated he had been chewing on the fentanyl patch for 20 to 30 minutes. McDougal directed Duncan to discard the patch and he complied.

At approximately 9:00 p.m., Duncan, McDougal, and Thomas arrived at the residence on Otey Road, where they found Candice and Amber Dalton, and Chris Cooper, who also observed Duncan's intoxicated appearance. McDougal encouraged Duncan to eat some food and drink tea which he did. After finishing the meal, Duncan passed out in the kitchen and McDougal wanted to call 911. Thomas convinced her not to call for help and offered that cooling Duncan's body with ice would remedy Duncan's situation. Ice was applied to Duncan's body which helped him regain a state of consciousness, but he was no less inebriated

in his appearance. McDougal encouraged Duncan to drink more tea and to walk around. At approximately midnight, the six occupants of the residence went to bed. McDougal witnessed Thomas putting a portion of a patch in his mouth. McDougal stayed with Duncan and watched him periodically throughout the night monitoring his breathing. At approximately 6:00 a.m., on November 29, 2007, McDougal woke up to find Duncan not breathing and without a pulse. McDougal alerted the other occupants, asked that someone call 911, and made preparations to perform CPR. Thomas intervened and insisted that performing CPR could further injure or even kill Duncan. Amber Dalton called 911 and alerted authorities to the emergency. After paramedics arrived, authorities directed McDougal, Thomas, Cooper, and the Daltons to go outside while Duncan was being treated. The five associates got inside a nearby vehicle to stay warm while they waited to hear about Duncan. Cooper later testified that he witnessed Thomas put something in his boot that appeared to be pills. McDougal testified that Thomas asked her who would pay for the patch fronted to Duncan, though this could not be corroborated by others in the vehicle. A short time after hearing about his roommate's death, Jason Politis found a fentanyl patch foil in a garbage can in the bathroom he had shared with Duncan.

As noted above, Thompson pled guilty to three counts: conspiracy to distribute Fentanyl, which resulted in death or serious bodily injury of another (Count 1); distributing or aiding and abetting in the distribution of fentanyl, the use of which resulted in serious bodily injury of another (Count 2); and distributing, or aiding and abetting in the distribution of a measurable quantity of fentanyl, the use of which resulted in the death of another (Count 3).

When Clarke went to the emergency department suffering from the fentanyl overdose, his physician noted that "fentanyl was used in a manner that put him at a high risk for death." PSR, ECF No. 203 ¶ 5. Thompson contends that because Clarke injected a mixture of rum and fentanyl from the patch supplied by Thompson, that it was the method or manner of use of the fentanyl that put Clarke at high risk of death and not the use of fentanyl alone. Reply, ECF No. 283 at 3. Therefore, he appears to argue, that had he been indicted after Burrage was decided, he could have argued for a shorter sentence because a jury would not have been able to conclude that the fentanyl patch was the "but for" cause of Clarke's overdose.

However, this argument misreads Burrage, as the case makes no allowance for the way in which the substance was used by a person who overdosed. Rather, the issues in the case were whether a defendant may be convicted under the "death results" provision of the statute "(1) when the use of the controlled substance was a 'contributing cause' of the death, and (2) without separately instructing the jury that it must decide whether the victim's death by drug overdose was a foreseeable result of the defendant's drug-trafficking offense." Id. at 208. The Court held that "at least where the use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury," the government must show that the use was the but-for cause of the injury. Id. at 892 (emphasis added). The Court did not consider whether a victim must use the drug in a particularly dangerous manner.

In this case, there is no disagreement that the fentanyl caused Clarke's overdose. While Clarke mixed the contents of the fentanyl patch with rum before injecting it, Thompson does not argue that the rum caused the overdose. Therefore, the fentanyl was an "independently sufficient cause" of Clarke's serious bodily injury. Moreover, an argument could be made that

13

it is always the "manner" in which a drug abuser uses a substance that causes injury or death. Fentanyl patches prescribed by a health care provider and used according to directions do not cause overdoses. It is the provision of the drug by a person unschooled in its use to another person unschooled in its use that creates the danger, realized here, that the patch will be used in such a manner that it will cause serious bodily injury or death. In effect, Thompson asks the court to find that Burrage placed an additional burden on the government, i.e., that it must prove that a particular drug was used in a particular manner that caused serious injury or death. Or perhaps Thompson is asking the court to extend the holding in Burrage to include the establishment of an affirmative defense, i.e., that if the defendant can show that the victim used the drug in a particularly dangerous manner, the defendant is not liable for distributing the drug that resulted in serious bodily injury or death. However, Burrage reached neither of these conclusions, either explicitly or implicitly. Accordingly, Burrage does not provide an "extraordinary and compelling" reason to reduce Thompson's sentence and his claim for compassionate release based on Burrage is **DENIED**.

### (2) Difference Between Codefendants' Sentences

Thompson pled guilty to Counts 1 through 3 in exchange for a 20-year sentence. Thomas proceeded to trial and a jury found him guilty on all four counts in the indictment. J., ECF No. 191 at 1–2. He was sentenced to a term of 300 months each on Counts 1, 2, and 3, and 120 months on Count 4, all to run concurrently, to be followed by a 3-year term of supervised release. Id. at 3–4. At the sentencing hearing, the court calculated Thomas's base offense level as 38 and added two points for obstruction of justice, which gave him a

base offense level of 40.[6] Thomas had a criminal history category of III, and which rendered a guidelines range of 360 months to life. Sent. Tr., ECF No. 211 at 67. The court explained that it originally was going to sentence Thomas to 240 months but was "terribly concerned" about the allegations of jury tampering. Id. Nevertheless, the court did not want to sentence Thomas to a term of 360 months, because it did not appear that Thomas intended for Duncan to die. Id. at 67–68.

On appeal, the Fourth Circuit reversed in part and vacated the judgment as to Counts 1 and 2 and remanded the case to the district court for resentencing. United States v. Thomas, 489 F. App'x 688 (4th Cir. 2012) (unpublished). The Fourth Circuit found that the district court erred when it denied a motion for acquittal on the Count 1 conspiracy charge. The court found that the evidence established only a "buyer-seller" relationship between Thompson and Thomas and did not establish that they had reached an agreement to distribute drugs. Id. at 691–92. The Fourth Circuit further found that the district court erred when it found that the trial court denied his motion for acquittal on the aiding and abetting count. Id. at 692. The appellate court held that the government did not show that Thomas

---

[6] The court heard evidence that Thomas learned from another inmate at the jail that the girlfriend of the other inmate was scheduled to appear for jury duty on the same day Thomas's case was set for trial. Sent. Tr., ECF No. 211 at 9. Thomas was able to confirm that the woman's name was on the jury list. Id. At Thomas's behest, the other inmate spoke to his girlfriend, in two recorded telephone calls from the jail, and told her that if she were picked for Thomas's jury and voted "not guilty," regardless of the evidence, that they might be able to collect some money from Thomas. Id. at 17–19. Alerted to the telephone calls from the jail to the potential juror, a federal law enforcement agent attended jury selection in Thomas's case. Id. at 19. The officer observed the woman, after she had been sworn to tell the truth, indicate that she had not read about or talked with anyone about the case, that no one had expressed to her an opinion about the case, and that she did not have a personal or financial interest in the case. Id. at 20–21. Law enforcement officers interviewed the woman, and she eventually admitted to having been encouraged by her boyfriend to find Thomas "not guilty" if she were picked to be on the jury. Id. at 21–25. Law enforcement officers also spoke to the potential juror's boyfriend, who confirmed that he had tried to persuade his girlfriend to vote "not guilty" in Thomas's case, after Thomas suggested he do so. Id. at 26–29.

15

knowingly associated himself with and participated in the criminal venture. There was no basis in the record "for a reasonable inference that Thomas's actions were for any purpose other than to facilitate his own sale of his own patches." Id. The court reversed Thomas's convictions on Count 1 and Count 2 and remanded his case for resentencing. Id. at 695.

Thomas also argued that the trial court abused its discretion in refusing his requested aiding and abetting instruction on Count 3, which pertained to the sale of the fentanyl patch to Duncan. Thomas claimed that Duncan bought the patch that killed him from Thompson and that Thompson's distribution of the patch to Duncan completed the crime and Thomas could not have aided and abetted a completed crime. He requested an instruction to the jury that "[a] person cannot be guilty of aiding or abetting a completed crime." Id. at 692–93. The trial court did not include the language, but instructed the jury that to be found guilty of aiding and abetting in Counts 2 and 3, the government had to prove that the defendant knew that the crimes charged were to be committed or were being committed; knowingly did some act for the purpose of aiding the commission of that crime; and acted with the intention of causing the crimes charged to be committed. Id. at 693. The Fourth Circuit found that the language "knew that the crimes charged were to be committed or were being committed" did not permit the jury to find that Thomas aided and abetted after completion of the crime. Id. Thus, Thomas's request was effectively covered by the court's instructions and the Fourth Circuit denied Thomas's claim as to Count 3.

On remand, Thomas was resentenced to a term of 240 months on Count 3 and 120 months on Count 4, to run concurrently, to be followed by a 3-year term of supervised release. Am. J., ECF No. 225 at 1–3. Thomas's guidelines sentence remained the same, 360

months to life. Statement of Reasons, ECF No. 226 at 1. In explaining why it sentenced Thomas to 240 months, the court explained the following:

> The court sentenced the defendant below the advisory guideline range based upon several factors. First, the defendant has proven to be a model prisoner during his months of incarceration. He has taken steps to receive certification in substance abuse treatment classes, plumbing apprenticeship, and others. Second, his codefendant received a sentence of 240 months custody and a similar sentence for this defendant avoids unwarranted sentencing disparities. Lastly, the defendant appears to be making the most of his time in custody, and he has improved himself mentally and physically. The court believes this progress should be acknowledged and encouraged.

Statement of Reasons, ECF No. 226 at 3.

Thompson argues that based on the remand in Thomas's case, which resulted in a 240-month sentence for Thomas, a sentencing disparity now exists between the him and Thomas and that the disparity is an extraordinary and compelling reason for reducing Thompson's sentence. Both Thomas and Thompson are now serving 240-month sentences, "despite Mr. Thomas's greater culpability, refusal to accept responsibility, and enhancement for obstructing justice before trial." Supp. Mot., ECF No. 273 at 7. Thompson acknowledges that because he entered into a binding plea agreement, the Fourth Circuit decision in Thomas does not allow the court to overturn his conviction or otherwise vacate the plea agreement he signed. However, he asks the court to consider that based upon the Fourth Circuit's decision in Thomas, had "Mr. Thompson gone to trial, been convicted of Counts 1 through 3, then appealed, the Court would have reversed the conviction on Counts 1 and likely for Count 3, which held Mr. Thompson responsible for the death of Mr. Duncan." Id.

Looking first at Thompson's argument that the fact that Thomas was resentenced to 240 months making his sentence equal to Thompson's creates a sentencing disparity because Thomas was more culpable, Judge Turk appears to have considered their relative culpability when he resentenced Thomas. Judge Turk knew that Thomas's guidelines range remained 360 months to life but reduced his sentence to 240 months based on his post-conviction behavior and institutional record. Judge Turk commented that because Thompson received a 240-month sentence, a similar sentence for Thomas avoided unwarranted sentencing disparities. Statement of Reasons, ECF No. 226 at 3. The fact that Thomas comported himself admirably during his early term of incarceration and his behavior was considered at resentencing does not provide a basis for reducing Thompson's sentence as Judge Turk weighed their relative culpability at trial and at resentencing.

Thompson's next argument, that had he gone to trial, been convicted of Counts 1 through 3, and then appealed, the Court would have reversed the conviction on Counts 1 and likely for Count 3, which held Mr. Thompson responsible for the death of Mr. Duncan, is conclusory and unsupported by the record. Thompson did not proceed to trial. Rather, he entered a plea agreement and received the benefit of his bargain with the government. His wholly speculative assertion about what might have happened had he chosen to proceed differently is not an "extraordinary and compelling" reason for a sentence reduction.

In addition, nothing about the Fourth Circuit's opinion regarding Count 3 in Thomas indicates that had Thompson challenged Count 3 in his hypothetical appeal, he would have prevailed. The Fourth Circuit denied Thomas's challenge to Count 3, finding that the court

18

had properly instructed the jury on "aiding and abetting." Thompson offers no argument as to why this holding would have likely resulted in Count 3 being dismissed in his case.

Thompson has failed to show that there is a sentencing disparity between himself and Thomas that could be considered an "extraordinary and compelling" reason for a sentence reduction. Because he has not shown an extraordinary and compelling reason to warrant a sentence reduction, the court need not address the § 3553(a) factors. See United States v. Malone, 57 F.4th 167, 174 (4th Cir. 2023) ("[I]f the district court has determined that the defendant's § 3582(c)(1)(A) motion has demonstrated extraordinary and compelling reasons for release, it must then turn to the relevant sentencing factors set forth in § 3553(a) 'to the extent ... they are applicable.'")

### III.

For the reasons stated, the court is unable to find that Thompson has shown that he has an extraordinary and compelling reason that would entitle him to a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). Because he has not established an extraordinary and compelling reason, the court will not address the § 3553(a) factors. Accordingly, the court **DENIES** Thompson's motions for compassionate release, ECF Nos. 255, 273. The Clerk is **DIRECTED** to send a copy of this opinion and the accompanying order to Thompson.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: August 30, 2023

Michael F. Urbanski
Chief United States District Judge